Our next case, United States v. West, Mr. Stewart. Good morning, your honors. Thank you. May it please the court, counsel Mark Stewart appointed counsel for Mr. West in this appeal. In June of 2010, Mr. West, along with others, was questioned by officers of the Chicago Police Department, essentially in connection with a report of stolen televisions. Mr. West eventually consented to a search of an address residence on South Loomis after receiving his Miranda warnings. Police went to the house up in an attic, found one of the two stolen televisions, and found an M1 rifle near the television in the attic. The rifle, in short, was described as being in pretty good condition, certainly was operable, as it turns out, and clean. The gist of our appeal, the guts of our appeal, if you will, are twofold. One is that the district court erred in not permitting the jury to hear evidence regarding whether Mr. West was subject to a mental condition that rendered him susceptible to suggestibility. Not that the officers suggested in the form of a leading question, for example, but that his mindset and attitude would be such that he would want to not only cooperate with law enforcement, but may actually want to tell them what they want to hear. Secondarily to that, there was evidence excluded on behalf of a family relative, an uncle, concerning whether Mr. West actually lived at the South Loomis residence or used it as a mailing address, what have you. And third, if you will, was the effort by defense to introduce evidence regarding a state identification card. Mr. West, when questioned at the 22nd District Station later in the day, was confronted by the officers. One officer testified that they said, essentially, we found this gun, and Mr. West said it was his, that he kept it in the attic because it was safe, and that he cleaned it off. The other officer's recount of the conversation was, we asked him about, or I asked him about the firearm, he said it was his, and that he kept it in the attic because it was safe. I remind the court that there were no identifiable prints or usable prints for purposes of identification from the firearm. So what it boils down to is, the only direct evidence that the government had that Mr. West possessed this firearm, even in a constructive possession mode, was the statement he gave them at the police station. And the defense effort was to give the jury information that would help them assess the trustworthiness, the reliability, credibility, whatever label you want to put on it, about what Mr. West allegedly said to the police. Not that the police were being disingenuous in their recount of the conversation, but that Mr. West may have been motivated by a mindset that said, I want to tell them what they want to hear. What was the evidence about where he lived? About where he lived? Right. From the defense perspective? Well, the totality perspective. What was the evidence about whether he lived at that home? Part of it was that when he consented to the search, he told them about the address, gave them the street address, and that address was denoted on the consent form. Well, that's what he said, where the other TV could be found, right? Did he also say that's where he lived? No, that's what I'm saying, is that he consented to a search because that's where the TV was found. I don't believe the record reflects that he said, I know that because that's where I live, or words to that effect. Or did he say, I have the other TV in my house, in the attic? He didn't call it my house? And not that clear, in my recollection, from the record either, Your Honor. Checkbook and some other items, his state identification card, and when he was asked where he lived by the police, he did say South Loomis. I don't know that he connected the two in the same way your question asked, but he did indicate that that's where he was, or that's where he was living. At the scene of the search, or back at the police station? Earlier in the day, when they were confronted about the first television. So when he's caught with the TV? I'm sorry? When he's caught with one of the TVs, that's when he said that? Or shortly after? I live on Loomis. Yes, before at the police station. Okay. And again, this gets into part of it as well, and the uncle was able to testify about this, is that Mr. West's father had passed away a year or two years before this, and there were items, the Korean veteran, an amputee, items from his service in the Korean War, and so forth. So even if Mr. West had been living at the South Loomis address for two or three months, or five to six months, or seven or eight months, the importance of this evidence about his perhaps being apt to tell the police what I think they want to hear looms large. And I submit, we submit, that it especially looms large when the officers were asked, after the court said to the defense, don't get into that. It sounds to me as if it's a backdoor way of getting, planting some seed in the jury's mind that they're going to speculate, maybe this guy is crazy and we shouldn't convict him. And defense counsel made an effort to indicate that this is not going to whether, to the intent element of a felon in possession charge, but again, the suggestibility. But when the police testified about the questioning of Mr. West at the station, they were asked, how did he appear? One of the officers said, well, he appeared normal, nothing out of the ordinary. Was he, did he appear to be disoriented or confused? No. And was he cooperative? Yes. And I, we submit that essentially those questions indicate the significance and therefore the magnitude of the error by the district court to exclude the expert testimony about Mr. West being subject to this notion of suggestibility. So why'd they wait till six days before trial to disclose this? That's the question. It really puts the government and the district court in a difficult position, either really the option is to continue the trial realistically. And so can you address that? In answer to your question about why wait until that point in time, I don't know the rationale or reasoning why. It may well have been, and I'm speculating, which is a dangerous thing to do. It may well have been that because this was one of the witnesses who had testified earlier in the suppression hearing and was based basically on the same report that the notion was this, this isn't a surprise witness. The government is aware of this expert, has seen this report and so forth. And I think it's important though, as your honor suggests, and that is what seemed to happen here wasn't a decision by the district court as to the potential merits of this evidence about suggestibility because the government said, I'm paraphrasing, but the government said we have no objection to the defense introducing evidence that may go to the trustworthiness or the reliability of his statement. But we do have a problem and that's notice. And I think a fair reading of the district court ruling was just that. If I were to be so bold as to say on a scale of one to 10, the timing of the notice, perhaps the thinness, if you will, paucity of information in the notice was 90% of the reason why the court excluded it. I mean, what an odd way to disclose it, to file a motion and eliminate saying, hey, we're intending to call some expert witness. You don't say who the expert witness is. You don't say what the person's going to testify to. You don't supply a report and it's four or five days before trial. It seems like a reasonable response to say, boy, you're out of luck. I would agree, Your Honor, but for the history that this case had enjoyed, if you will, before, which was suppression hearings about his competency to stand trial, his ability to give a knowing and voluntary consent to the search. So, you know, this wasn't a, the whole notion that his psychiatric or his mental condition could be an obstacle put everybody in a bit of a bind. But I don't know because that it would have necessitated a lengthy continuance of the trial. Again, this wasn't somebody that just showed up. This wasn't a witness who just popped up for the first time a week before trial. Yeah, an unenviable position, no doubt. But when we think in terms of the context of it, the court having told the defense, I don't want you to be talking about, and again I'm paraphrasing, talking about this man's mental state because I don't want the jury speculating about it. And then the government turns around and says, how did he appear? Did he appear to be normal? Did he appear to be disoriented or confused? No, no. Was he cooperative? I mean, those are the kind of things that would not surprise me if the expert were to say, look, somebody who suffers from this notion of suggestibility is not going to look confused. They're going to be motivated to say, I know you want me to say yes to that question, so I'm going to say yes. He isn't necessarily going to look disoriented, confused, and at a minimum, is going to want to be cooperative. That it? Briefly, if I may, in terms of the argument on the armed career criminal status, and that is we acknowledge that defense counsel did not tender a proposed jury instruction that said the elements for this include a finding by the jury of three prior convictions, and so forth. I believe the transcript reflects that when the court went through its jury instruction conference, defense counsel didn't affirmably say, I have no objection. It appears as though defense counsel was silent on that. We acknowledge that. The first time it was raised, but it was raised before sentencing, was in defense objection to the PSR. So we submit, by virtue of the fact that it was raised prior to sentencing, it would be inappropriate to deem that issue forfeited, but even if forfeited, we respectfully submit that it constitutes plain error, as the government points out in its brief. The Allene case came out a few days before West. We submit that based on that, it was error, and it was plain error, and it certainly affected Mr. West's substantial rights, at the risk of stating the obvious, rather than a 10-year maximum before being a felon in possession, he was subject to and received the mandatory minimum of 15 years. The notion of prior convictions being an element of a crime, of course, are part of every felon in possession case. Every one that I can recall that I participated in as an assistant U.S. attorney in the two districts I worked in, and the few I've been exposed to, on the defense side, 99 percent, if higher, stipulate to the conviction. And the concerns that some courts have mentioned that, well, if we make the three conviction, violent crime, drug offense, an element, then the defendant's going to be subjected to a jury hearing about three, four, five convictions. As noted, there are workarounds. Some defendants may stipulate that they have the requisite number of convictions. That's their option. This is an argument that can only be made to the U.S. Supreme Court. It is, and I am mindful of this court being in the position as it is, and the detention, to the extent there is, between Alleyne and Almendarez-Torres, is for them to resolve. And with that, I'll take my cue to conclude my remarks. Thank you. Okay. Thank you, Mr. Stewart. Ms. Murphy? Thank you. May it please the Court. Opposing counsel. I'm Madeline Murphy. I don't understand why he was charged with a gun offense. He hadn't used a gun, he hadn't used guns in his previous criminal activities, had he? Pre-sentence report doesn't suggest that any of his previous convictions were for crimes that involved guns. That is correct, Your Honor. I do not believe that his prior offenses involved guns. And did he have ammunition for this rather ancient gun? Yes, he did, Your Honor. There was ammunition in the house, the gun was loaded, the gun was clean, and the gun was in good condition. Was that ammunition also 40 years old?  Well, it could be important, couldn't it? Not necessarily. I don't think ammunition lasts forever. The gun itself was loaded, Your Honor, regardless of the age of the ammunition that was elsewhere in the house. I'm asking whether the government showed good judgment in charging him with a gun offense. Apart from the mental activity, sure, he has a criminal record, an unpleasant criminal record. He's never used guns. This thing is some kind of antique, you know, it's his father's possession. It seems to be, he doesn't appear to live there. And, yes, he has the gun. But he doesn't usually use rifles in a crime. But in any event, no suggestion that he would ever use that rifle. Judge, there was no evidence in the record that he had ever used the rifle. He had a decades-long history of violent crimes. There was significant evidence in the record that he, in fact, did live in that house. But he never used guns. He used knives and what have you. That is correct. And then he's got this antique gun. What kind of gun is it, by the way? Judge, it was a rifle that was purchased from the government. Yes, I know it was a rifle. What kind of rifle, what caliber, et cetera, who makes it? Is it a military rifle? It is not a military rifle, Your Honor. It was purchased in 1967. Is it for hunting squirrels or what? Possibly for hunting squirrels. You don't even know the caliber? Judge, I don't know the caliber off the top of my head. I'm sorry, Your Honor. It should be a .22, right? Used for shooting mice or something. The Felony Possession Statute prohibits the use of a felony. Look, I know that. I'm talking about the judgment. Did he have any more serious gun offenses to prosecute? This particular case was presented to us. Especially since the guy does have a mental problem. That's a significant issue. But you'd think with everything going on here, it's an ancient gun, he hasn't used guns in his prior crimes, he has mental problems. I don't know why, what kind of prosecutorial judgment convinces you to send him away for 15 years? Judge, he had a long history of violent crimes. He did have a mental problem. But not with guns, right? That is correct, Your Honor. That is correct. Well, doesn't that mean something? The Felony Possession Statute doesn't require that the prior offenses have to do with guns. I know what the statute provides. I'm talking about judgment. Filling up the prisons with people because there's a technical violation of one of these draconian federal criminal statutes. Judge, I'll pass that along to the office, the Court's concern about discretion in this particular case. To address the issue here, the District Court did not abuse its discretion in borrowing the expert testimony that was proffered. True, the testimony was late, but that wasn't the major issue here. The major issue here was the proffered expert testimony lacked a critical link between the test scores that the defense proposed to have Dr. Dinwiddie testify about and the false confession. The jury would have been left to speculate as to the connection between the test scores and this false confession. I don't understand that. He testified that he's suggestible. He's easily suggestible. So doesn't that mean that he's more susceptible to making a false confession? Not in every circumstance. Wouldn't that be for the jury to sort out? Not necessarily. There's a grave danger of the jury taking this evidence and speculating about it and perhaps being misled by this evidence. The Gugitsen Suggestibility Scale gives the defendant or the test proponent a passage to read, then has the person answer some questions on it, allows a period of time to pass, and then the... Now what's this about the jury being bamboozled by this person? On these facts, it's possible that it could have been... So no expert testimony in criminal cases? No. Suggesting... The expert testimony in a criminal case must be helpful to the jury, must be based in science, and there must be a link between the science and the facts of this particular case. In the Gugitsen situation, the individual is then confronted by a stern authority figure about the answers they gave on that test. I don't believe you. I don't like the answers that you gave on that test. And then the individual, if they are suggestible, changes their answers. That is exactly the opposite of what happened in this case concerning the defendant's initial statement. He's in the back of the police car. Officer Carroll believes that Mr West has burglarized the home of the victim and stolen the television and confronts him. Mr West says, No, I did not burglarize that house. Officer Carroll says, Again, I believe you burglarized the house. And West says, No, I did not commit any burglary. Officer Carroll states that West was adamant that he did not commit the burglary. West says, I do have the television in my attic. That is exactly the opposite... Well, that all sounds like the kind of thing you would argue to the jury. But that's the exact opposite of what this proffered psychological testimony would have said. What would have happened here is the jury would have heard this evidence concerning this interchange between Officer Carroll and West where West refused to be suggested. Now you're saying that the jury would, of course, have rejected the psychiatric testimony because he would have said, Well, you know, he wasn't suggestible about the burglary, right? It's possible that... You know, this is really just echoing what Judge Simon was saying. You're very distrustful of a jury. You don't want them to listen to this stuff. Without the link between the tests that the expert was going to testify about and the specific facts of this case, it would have been irrelevant. It would not have been proletarian. How is that irrelevant? I don't understand that. Because the jury instruction, there's jury instruction in the Seventh Circuit. When the government chooses to offer a statement of the defendant, the jury is instructed that they're to evaluate that defendant's statement. And in doing that, they have to consider the defendant's personal characteristics and circumstances. That's what the instruction says. So why wouldn't Dinwiddie, Dinwiddie, his testimony, go plainly to that inquiry that the jury has to make in evaluating the statement? Because Dinwiddie never asked Mr. West about the circumstances of the statement in the police station. It's not the circumstances of the giving of the statement. It's the defendant's personal circumstances that's important. But in the Gudjonson test, the circumstances of the statement itself are very important. There is a protocol where the individual gives a particular answer and then is confronted by a stern authority figure and then changes that answer. There's no evidence in the record that this happened concerning the statement that occurred at the police station. And the evidence in the record is exactly the opposite happened with the statement concerning whether the defendant had burglarized the victim's house or not. Can I ask a fact question along those lines? Because you say that the statement occurred at the police station. That is correct. But in the statement that was reduced to writing, it says that it was taken at 1630, which is 430. That's when he was arrested first. That's not... 630 is when he ostensibly gives the statement. Yes, Judge. What you're looking at is a note that was made, I believe, by the state prosecutor in talking with the agents about the case. That is not a memorialization of the defendant's statement. The defendant's statement took place sometime after 6 o'clock while at the police station. Even though this said it, oral statement time 1630, 430. That is correct, Your Honor. There's some testimony about that in the suppression hearing to the effect that no foundation could be laid as to who specifically wrote that other than it was not the officers in the case and it was not part of the police reports in this case. The evidence in the case, the evidence at trial, was that the officers went to West at the police station at some point after 6 o'clock that evening and told him, we found the television in the attic and we also found this rifle right next to the television. What do you have to say about that? So under these circumstances where the jury would have heard about this first statement which the defense is not contesting where West was confronted to the effect that we don't like your answer, no, we think you burglarized that house and you refused to put it on that jury. Those are very different situations. They are very different situations, Your Honor. They are. You can see how he would deny committing a crime but then when the questions shift and he's no longer being he's being asked what seemed like less directly threatening questions he might not be able to answer them intelligently. But that was the gist of the expert testimony that they were offering, this Guginson suggestibility scale. They wanted to argue Look, there are degrees of suggestibility and you may be very suggestible but there are certain things that you will not agree to the suggester. But the expert proffer was lacking in any of those degrees of suggestibility. The proffer consisted solely of a recitation of West's IQ and his score on the Guginson suggestibility scale. The proffer was lacking any link between that and the false confession. It was lacking any discussion that Dr. Dinwiddie may have had. Actually the evidence appears that Dr. Dinwiddie never questioned West about the circumstances surrounding this confession. Whether an authority figure confronted him and made him change his answer as to whether the rifle belonged to him or not. And without that critical link the court correctly kept it out because the science... Are you saying that suggestibility requires proof of changing one's answer? No, I'm saying that the specific evidence that the defense offered in their expert proffer, this Guginson suggestibility scale, requires that sort of a protocol. And the specific... Well, now then I don't understand your answer. Are you saying that you must change your... You can't be found to be suggestible. Is that what you're saying? I'm saying that... No, is that what you're saying, yes or no? That's not what I'm saying, Your Honor, on these facts. The expert evidence that was proffered was to the effect that when given this set of circumstances, when being confronted by a stern authority figure, West would change his answer, change a previously given answer. The expert proffer didn't go into any other circumstances. It didn't go into the idea that West was just suggestible for whatever reason. In fact, it never really discussed Mr. West himself. The expert proffer set forth that the expert would talk about his IQ, would talk about the Guginson suggestibility scale, but never went into any specifics as to how to apply that information to this particular allegedly false confession. But that's not what the expert said in his report. What he said was, in the concluding paragraph, was that at the time of his arrest and then skipping to the end of the paragraph, there's evidence of significant suggestibility and passive acquiescence when pressured by authority figures. So it's not... This was the report that you all argued about at the suppression hearing. It's his 18-page report that goes into all the testing that he did. So his opinion was this guy was highly suggestible, to sort of sum it up. And in light of the fact that you all asked the police officers, did this guy seem to understand what you were talking about, was he with it, all of those questions that counsel pointed out, doesn't that kind of open the door to allow them to offer some contradictory evidence that this is somebody who's very passive and is going to acquiesce to law enforcement? But that wasn't the evidence that they were trying to offer, that he was passive and he was acquiescent. They were trying to offer solely evidence that he had a low IQ and that he tested high on the Guginson suggestibility scale. The report that you're looking at, Your Honor, dealt with his competence to waive his Miranda rights and to consent to the search. He was never examined specifically on the issue of whether he gave a false confession or not. I understand that, but it's all the same test, whether somebody is highly suggestible or not. It wouldn't be a different test that you would administer when you're trying to determine if he signed a consent versus whether he said something that wasn't true. It would be the same test you would administer. First of all, those same tests went into Dr. Dinwiddie's conclusion that the defendant was competent to waive his Miranda rights. And secondly, those tests, divorced from specific facts about how the false confession allegedly occurred, is not probative of whether that was a false confession. It's not just that he scores high on a suggestibility test and that he has a low IQ. There has to be a link to the actual confession itself. Did they simply walk in and say, Mr. West, what did you think about the fact that we found a rifle in your attic? Or did they go in and say, Mr. West, there was a rifle in your attic, is it yours? And he responds no, and they say, that is ridiculous, we know that was your rifle, we know that was your rifle. That would be a situation where the Guginson suggestibility scale would be directly relevant if an expert were there and able to link the test results with the actual facts and issues. That was the problem here. We simply had expert testimony about test results. We didn't have, or they didn't offer proper expert testimony about this specific false confession, which was not handled in the suppression motion concerning it. So it sounds like it is your position that this sort of expert testimony is only admissible if there is some evidence of badgering or some other kind of tactics to get the suspect to spill his guts. That there has to be some kind of evidence of overcoming his will. There has to be some evidence about the false confession itself, that the doctor examined the false confession itself, the circumstances surrounding that, in conjunction with the test results. Is there something in the evidence rules that requires an opinion about the ultimate fact issue in the case? I thought that's not actually generally... No, this isn't an ultimate fact issue in this case. The problem is that the doctor never examined Mr. West, never questioned Mr. West about the circumstances of this confession at all. It appears he may have made, or the defense wanted the jury to infer just the blanket conclusion that because Mr. West had a low IQ and tested high on the score of suggestibility, that invariably he would give false confessions. I thought the main issue was his waiver of Miranda rather than a false confession. I'm sorry, Your Honor? I thought the main issue was his waiving of Miranda... He was examined. ...rather than a false confession. That was the issue in the initial suppression hearing, was whether he was competent to waive his Miranda rights. And among the tools that the doctor used in determining that he was capable of waiving his Miranda rights were his low IQ and the suggestibility scale. So those tests don't lead directly to the conclusion that an individual who has those test scores is going to confess falsely or is not competent to waive his Miranda rights. There needed to be more about the statement itself in order for the test results to be helpful to the jury. More about the statement itself? Yes. What do you mean? There needed to be more. There needed to be some understanding of how the questions were asked of Mr. West at the police station, whether the officers confronted him, whether they were antagonistic to him, whether they physically coerced him or something like that. There needed to be more about the statement itself beyond simply the fact that he had a low IQ and that he tested high on the suggestibility score. Was the request for Miranda... Was the reading him the Miranda rights, was that recorded? No, it was not recorded. So how would we know what tone the police used? Both of the officers testified... Oh, yes, they would testify, but how would the jury know what the tone of the manner of the officers was? Your Honor, the Miranda rights, the Miranda waiver was not at issue at trial. The defense did not raise that issue at trial, so the evidence in the record concerning the Miranda rights is limited. If I'm understanding the court's point. Okay, well, thank you. Thank you, Ms. Murphy. Thank you, Your Honor. Mr. Stewart? If I might. Thank you. Your Honor, I am unfortunately unable to point you to a citation in the record, but would be happy to do so later. But it's my understanding the firearm was an M1 Garand firearm made by Universal Firearms, which went out of business. That's a World War II, right? Yeah, it may not be a Garand, but my recollection is there's reference to it as an M1, which would suggest, as Your Honor's answer indicates, and I've prosecuted M1 Garand cases, you don't carry those around for hunting squirrels. Those are military weapons because of their stamina, if you will. And the defense was that this firearm belonged to the late father. Exactly, and it fits in with this whole notion of suggestibility, as the panel has indicated. When he's at the police station being questioned, for all he knows, clueless, for all we know, clueless about the fact that having his father's rifle in the attic, that all he's ever done is clean it out of respect for his deceased father, is a problem for him? And the police actually don't come in and berate him, but do the, hey, on this gun, what can you tell us about it? Oh, that's mine. They didn't ask him where he got it, how he got it. He may well have said, that was my dad's, whatever. And to the point I think in part the panel's also interested in is the government's notion that in order for this expert to opine about the reliability of Mr. West's statement, he needed to know more about that statement. Well, they can't have it both ways. Mr. West's statement at the 22nd Precinct was neither audio recorded or video recorded. The only evidence that any expert would have ever had would have been the two police officers saying, he appeared to be normal, not disoriented, not confused. We asked him about the gun. He said, it's mine, I keep it there, it's because it's safe, and I keep it clean. And as Your Honor indicated, this was not posited as an expert going to the ultimate opinion. When he said those things at the 22nd District Station, he was doing so because he was suggestible. That's not what experts do. This person suffers from the hypothetical. What about this? What about that? Your Honor is correct. He could not have gone to the ultimate question. And so this notion of knowing more about the statement, what was said, who said it, and how it was said, goes above and beyond what this was all about. We ask that the Court reverse Mr. West's conviction, remanding for a new trial. If the conviction is affirmed, we ask that the Court, mindful of the precedent and so forth, vacate the sentence and remand for re-sentencing. If I could just really quick clarify something about your argument. At one point in your argument, you mentioned the Sixth Amendment, but then the argument basically proceeded as an evidentiary claim. So I assume that you're claiming evidentiary error and not constitutional error. Yeah. Okay. So you were appointed, were you not? Yes, Your Honor. Well, we thank you for your efforts on that. Okay.